**This document has been electronically entered in the records of the United States Bankruptcy Court for the Southern District of Ohio.**

**IT IS SO ORDERED.**

**Dated: December 09, 2005**

John E. Hoffman, Jr.
United States Bankruptcy Judge

_____

## UNITED STATES BANKRUPTCY COURT
### SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION AT COLUMBUS

|  |  |  |
|---|---|---|
| *In re*: | : | |
| | : | |
| PAUL ALLEN TUDOR and | : | Case No. 03-68935 |
| PHYLLIS JEAN TUDOR, | : | Chapter 13 |
| | : | Judge Hoffman |
| *Debtors*. | : | |

### MEMORANDUM OPINION

Chase Manhattan Mortgage Corporation ("Chase"), which holds a claim secured by a mortgage on the residence of the Chapter 13 debtor, Paul Allen Tudor ("Debtor"), filed a proof of claim that includes a mortgage arrearage of $9,230.35. The Debtor objected to the arrearage claim, arguing that three specific components of the claim should be disallowed: (1) prepetition attorney fees of $950 incurred by Chase in connection with a state court foreclosure action ("Prepetition Fees"); (2) prepetition costs of $450 for title work done in anticipation of the foreclosure action ("Costs"); and (3) attorney fees of $125 incurred by Chase after the filing of this case ("Postpetition Fees"). In determining whether the challenged Prepetition and Postpetition Fees (collectively, "Fees") and Costs are properly included in Chase's arrearage claim, the Court's guidepost is

§ 1322(e) of the Bankruptcy Code,[1] which provides that "if it is proposed in a plan to cure a default, the amount necessary to cure the default shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law." 11 U.S.C. § 1322(e). Here, while there is no dispute that the note and mortgage signed by the Debtor grant Chase the contractual right to recover its Fees and Costs, the parties disagree as to whether the attorney fee provisions in the loan documents are enforceable under Ohio law.

The Debtor asserts that Chase's recovery of the Fees is barred by statute—namely, Ohio Revised Code § 1301.21—and Ohio case law. Because Ohio Revised Code § 1301.21 applies only to commercial, and not residential, lending transactions, the Court concludes that the statute's limitation on the enforceability of attorney fee provisions—allowing recovery only in transactions where the debt incurred exceeds $100,000—is not applicable in this case. Thus, Debtor's assertion that there is a statutory basis for disallowance of the Fees is incorrect. Chase's recovery of the Fees is, however, barred by Ohio common law. Under the Ohio Supreme Court's decision in *Miller v. Kyle*, 97 N.E. 372 (Ohio 1911), contractual provisions in debt instruments calling for the payment of attorney fees upon a borrower's default are contrary to public policy and unenforceable. This common law rule ("Common Law Rule") applies here and precludes Chase from collecting the Fees. And, contrary to Chase's contention, recovery of the Fees may not be based on an exception to the Common Law Rule recognized by the courts in *Davidson v. Weltman, Weinberg & Reis*, 285 F.

---

[1] On April 20, 2005, the Bankruptcy Abuse Prevention and Consumer Protection Act ("BAPCPA") was signed into law. Because the Debtor's bankruptcy petition was filed before April 20, 2005, the amendments to the Bankruptcy Code made by BAPCPA are not applicable in this case. Thus, all references to the Bankruptcy Code, and all citations to, or quotations of, specific Code provisions, shall refer to the Code (or particular sections of the Code) prior to its amendment by BAPCPA—i.e., 11 U.S.C. §§ 101–1330 (2000).

2

Supp. 2d 1093 (S.D. Ohio 2003) and *Washington Mutual Bank v. Mahaffey*, 796 N.E.2d 39 (Ohio Ct. App. 2003). The *Davidson* and *Mahaffey* courts held that provisions in debt instruments conditioning a borrower's right to reinstate a mortgage on payment of the lender's attorney fees and costs expended in foreclosure proceedings are not contrary to public policy and thus are enforceable. Because cure of a mortgage arrearage through a Chapter 13 plan does not constitute a contractual mortgage reinstatement, the reinstatement exception to the Common Law Rule is not applicable in this case. In reaching the conclusion that the Fees are not an allowable component of Chase's arrearage claim, the Court rejects two additional arguments advanced by Chase: (1) that recovery of the Postpetition Fees is authorized by § 506(b) of the Bankruptcy Code; and (2) that the doctrine of equitable estoppel requires allowance of the Fees and Costs. Finally, the Court concludes that Chase's recovery of the Costs is permissible under Ohio law. Contrary to the Debtor's contention, the Court is not persuaded that the Costs are, in fact, disguised attorney fees.

This memorandum opinion constitutes the Court's findings of fact and conclusions of law. *See* Fed. R. Civ. P. 52 (made applicable here by Fed. R. Bankr. P. 7052 and 9014).

## I. Jurisdiction

The Court has jurisdiction over this contested matter pursuant to 28 U.S.C. §§ 157 and 1334 and the general order of reference entered in this district. This is a core proceeding. *See* 28 U.S.C. § 157(b)(2).

## II. Factual and Procedural Background

On March 15, 2002, Paul Allen Tudor and Phyllis Jean Tudor[2] (collectively, "Tudors") executed and delivered a $100,000 promissory note ("Note") to Chase to finance their purchase of a single-family residence located in Pataskala, Ohio. To secure their payment obligations under the Note, the Tudors signed a mortgage ("Mortgage"), thereby granting Chase a lien on their home.

On November 24, 2003, Chase filed a foreclosure action against the Tudors in state court, alleging that they had defaulted in their payments under the Note and Mortgage. The Tudors responded by filing a voluntary petition for relief under Chapter 13 of the Bankruptcy Code on December 15, 2003.

The Court confirmed the Tudors' Chapter 13 plan on February 18, 2004. The plan calls for the Debtor to make monthly payments to the Chapter 13 Trustee of "$1,760.00 to plan end (but not to exceed 60 months[)] for a 10% dividend." Order Confirming Chapter 13 Plan (Doc. 17) at 2, ¶ 1 (emphasis deleted). Following confirmation of the plan, Chase filed the proof of claim at issue here. In its proof of claim, Chase listed a principal balance of $98,736.98 and an arrearage of $9,230.35 ("Arrearage Claim"), which includes the Fees and Costs. The Debtor filed his objection to the Arrearage Claim ("Objection") (Doc. 22), asserting that both the Fees and Costs constitute "attorney's fees," and that "[s]uch charges are not permissible under Ohio law." Objection at 1.

---

[2]On April 26, 2004, Debtor filed a Suggestion of Death of Co-Debtor, Phyllis Jean Tudor (Doc. 23), informing the Court that Mrs. Tudor had died on February 10, 2004. Because his wife's death did not affect the Debtor's ability to make payments in accordance with the terms of his confirmed Chapter 13 plan, he moved for an order authorizing the continued administration of his case, which was granted by the Court. *See* Order on Debtor's Motion to Continue Administration of Chapter 13 Case (Doc. 28); Fed. R. Bankr. P. 1016. In this opinion, Mr. and Mrs. Tudor will be referred to collectively as the "Tudors," and Mr. Tudor will be referred to, individually, as the "Debtor."

Chase filed a timely response,[3] arguing that the Fees and Costs are properly included in its Arrearage

Claim.  The parties then briefed the issue of whether the Fees and Costs are recoverable under Ohio

law[4] and supplemented the record by filing their Joint Stipulation of Facts ("Stipulation") (Doc. 35).

The parties agree that their dispute is limited to the issue of whether the Fees and Costs are

allowable components of the Arrearage Claim.

The Mortgage contains four separate provisions that call for the Debtor's payment of Chase's

attorney fees and costs upon the occurrence of certain conditions.  Three of these provisions—§§

9, 14 and 22 of the Mortgage—are default-based, i.e., the Debtor's contractual obligation to pay

attorney fees and costs is triggered by a default under the Mortgage ("Default Provisions"). The

Default Provisions are set forth in relevant part below.

### 9.      Protection of Lender's Interest in the Property and Rights Under this Security Instrument

If (a) Borrower fails to perform the covenants and agreements
contained in this Security Instrument, (b) there is a legal proceeding
that might significantly affect Lender's interest in the Property and/or
rights under this Security Instrument (such as a proceeding in
bankruptcy, probate, for condemnation or forfeiture, for enforcement
of a lien which may attain priority over this Security Instrument or to
enforce laws or regulations), or (c) Borrower has abandoned the
Property, then Lender may do and pay for whatever is reasonable or
appropriate to protect Lender's interest in the Property and rights
under this Security Instrument, including protecting and/or assessing
the value of the Property, and securing and/or repairing the Property.
Lender's actions can include, but are not limited to:  (a) paying any

---

[3]*See* Chase Response ("Chase Resp.") (Doc. 25).

[4]*See* Debtor's Supplemental Memorandum in Support of Objection to Claim of Chase Bank
("Debtor's Supp. Mem.") (Doc. 34), Chase Manhattan Mortgage Corporation's Memorandum and
Supplemental Memorandum in Support of Response to Debtors' Objection to Claim ("Chase Supp.
Mem.") (Doc. 37) and Debtor's Second Supplemental Memorandum in Support of Objection to
Claim of Chase Bank (Doc. 43).

sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) *paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding.* Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Mortgage, § 9 (emphasis added).

### 14.    Loan Charges.

*Lender may charge Borrower fees for services performed in connection with Borrower's default*, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, *including, but not limited to, attorneys' fees, property inspection and valuation fees*[.] In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law[.]

Mortgage, § 14 (emphasis added).

### 22.    Acceleration; Remedies.

Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument, foreclosure by judicial proceeding and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and foreclosure. If the

default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may foreclose this Security Instrument by judicial proceeding. *Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, costs of title evidence.*

Mortgage, § 22 (emphasis added).

The fourth attorney fee provision in the Mortgage requires the payment of Chase's "expenses incurred in enforcing the [Mortgage], including . . . reasonable attorneys' fees" if the Tudors exercise their contractual right to reinstate the Mortgage after default ("Reinstatement Provision").

Mortgage, § 19. The Reinstatement Provision provides:

### 19.      Borrower's Right to Reinstate After Acceleration.

If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of:  (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate, or (c) entry of a judgment enforcing this Security Instrument.   Those conditions are that Borrower:  (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; *(c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument;* and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged.  Lender may require that Borrower pay such reinstatement sums and expenses in one of the following forms, as selected by Lender:  (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer.  Upon

7

> reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18 [addressing transfer of the Property without Lender's consent].

*Id.* (emphasis added).

By way of their Stipulation, the parties agreed that Chase is an oversecured creditor. *See* Stipulation ¶ 8 ("On 12/19/2003 the appraised value of the property was determined to be $130,000.00 and such value exceeds the total amount of [Chase's] claim."). Further, the parties stipulated that the Costs were incurred for title work "performed by attorneys, paralegals, legal assistants or other employees of [Chase's] legal counsel . . . in connection with the foreclosure action. . . ."). *Id.* ¶ 7.

### III. Arguments of the Parties

The Debtor argues that Ohio Revised Code § 1301.21's limitation on the recovery of attorney fees—authorizing the recovery of fees only in contracts of indebtedness *exceeding* $100,000—bars Chase's recovery of the Fees. Because the Tudors' original mortgage debt did not exceed $100,000—they borrowed exactly $100,000 from Chase—the Debtor maintains that the Fees are not properly included in the Arrearage Claim. Chase responds by pointing out that § 1301.21 governs only commercial contracts of indebtedness. Since the statute's $100,000 debt threshold does not apply in the context of residential mortgage transactions, Chase submits that § 1301.21 does not mandate the disallowance of its Fees.

The Debtor asserts that the Common Law Rule also bars Chase's recovery of the Fees. According to the Debtor, the Common Law Rule renders the attorney fee provisions in the Note and Mortgage unenforceable and, thus, Chase's Fees are not a proper component of its Arrearage Claim.

8

To counter this argument, Chase invokes the reinstatement exception to the Common Law Rule recognized by the District Court in *Davidson*.  Relying on the Ohio Court of Appeals' decision in *Mahaffey*, the *Davidson* court held that contractual provisions calling for payment of a lender's attorney fees and costs as a condition of mortgage reinstatement are enforceable.  According to Chase, because its Mortgage contains the Reinstatement Provision (which expressly authorizes collection of attorney fees and costs upon mortgage reinstatement), and because the Debtor has, in effect, reinstated the Mortgage through his Chapter 13 plan, its recovery of the Prepetition Fees and Costs should be allowed.  With respect to the Postpetition Fees, Chase submits that they are recoverable under § 506(b) of the Code, given its status as an oversecured creditor—i.e., the value of the residential real estate securing Chase's claim exceeds the Debtor's outstanding mortgage debt. As a fall-back position, Chase asserts that the doctrine of equitable estoppel compels the allowance of its Arrearage Claim, including the challenged Fees and Costs.  It would not be equitable, Chase argues, to allow the Debtor to reinstate the Mortgage through his Chapter 13 plan without requiring him to honor his contractual obligation to pay Chase's Fees and Costs as a condition of reinstatement.

The Debtor urges the Court not to recognize the reinstatement exception to the Common Law Rule, arguing that *Davidson* and *Mahaffey* are wrongly decided. He relies on decisions holding that the Common Law Rule renders *all* attorney fee provisions in debt instruments void and unenforceable—including those provisions that require the borrower to pay attorney fees as a condition of reinstatement.  *See In re Landrum*, 267 B.R. 577 (Bankr. S.D. Ohio 2001); *In re Lake*, 245 B.R. 282 (Bankr. N.D. Ohio 2000).  Arguing in the alternative, the Debtor submits that even if *Davidson* and *Mahaffey* are good law, these decisions are inapposite because, unlike the mortgagors

9

in *Davidson* and *Mahaffey*, he has not exercised his contractual right of reinstatement. Rather, he has chosen to reinstate his mortgage through a Chapter 13 plan, utilizing the statutory cure mechanism afforded by § 1322(b)(5) of the Code. Thus, the Debtor claims that even if the Reinstatement Provision is enforceable under Ohio law, it simply was not triggered here because he did not, in fact, exercise his *contractual* right of reinstatement. Insofar as the Postpetition Fees are concerned, the Debtor asserts that, because § 1322(e) expressly supercedes § 506(b), the fact that Chase holds an oversecured claim is legally irrelevant. According to the Debtor, because § 1322(e) makes state law—and, specifically, the Common Law Rule—outcome determinative, the Postpetition Fees must be disallowed, notwithstanding Chase's oversecured status.

Finally, as to the Costs, the Debtor submits that they were incurred by Chase for pre-foreclosure title work done by attorneys or paralegals. Although denominated "costs" rather than "fees," the Debtor maintains that these charges, in fact, constitute disguised attorney fees, and their recovery should be barred by the Common Law Rule. For its part, Chase contends that the Costs are just that—charges for routine title work done in connection with its state court foreclosure action. According to Chase, the fact that the Costs were incurred for title work performed by attorneys or paralegals does not mean that they constitute disguised attorney fees as the Debtor argues.

## IV. Law and Analysis

### A.    Introduction

To resolve this contested claim proceeding, the Court need not decide whether to follow the line of authority—represented by the *Landrum* and *Lake* decisions—that reads *Miller* and its progeny broadly, holding that *all* attorney fee provisions in debt instruments are void, or

alternatively, to recognize the reinstatement exception to the Common Law Rule carved out by the *Davidson* and *Mahaffey* courts. Here, whether the Common Law Rule is broadly or narrowly applied, the outcome is the same—Chase's claim for the Fees must be disallowed. Under a broad reading of the Common Law Rule, Chase's claim for recovery of the Fees fails because all of the attorney fee provisions contained in the Mortgage—the Default Provisions and the Reinstatement Provision—would be deemed void and unenforceable. But even if the Court recognizes the reinstatement exception—as did the *Davidson* and *Mahaffey* courts—it does not provide a basis for allowance of the Fees for two reasons. First, as the Debtor correctly points out, the Reinstatement Provision was not triggered here because the Debtor did not actually invoke his contractual right of mortgage reinstatement. Instead, he chose—by filing a Chapter 13 case—to utilize the statutory cure mechanism provided by § 1322(b)(5) of the Code. Thus, even if the Reinstatement Provision is enforceable, it is simply not operative here. Second, the Court is unpersuaded by Chase's argument that the Debtor should be required to pay Chase's Fees because his cure of the mortgage arrearage through a Chapter 13 plan is the functional equivalent of a contractual mortgage reinstatement. As explained below, there are fundamental differences between a contractual mortgage reinstatement and the statutory right of cure afforded a Chapter 13 debtor—most notably, the debtor's ability to cure his mortgage arrearage over time, rather than in a single, lump-sum payment as Chase's mortgage contract requires.

With respect to the Postpetition Fees, the Court concludes that § 1322(e) expressly trumps § 506(b) and makes state law, rather than a creditor's oversecured status, determinative of the creditor's right to recover postpetition attorney fees as part of an arrearage claim. Because the

Common Law Rule is not limited in its application to prepetition attorney fees, Chase's Postpetition Fees also must be disallowed.

In reaching the conclusion that Chase's claim for its Fees must be disallowed, the Court considered, but rejects, two alternative arguments advanced by the parties in support of their respective positions: (1) the Debtor's contention that Ohio Revised Code § 1301.21 is applicable and bars Chase's recovery of attorney fees since the Tudors' original mortgage indebtedness did not exceed $100,000; and (2) Chase's assertion that the doctrine of equitable estoppel requires the allowance of its Fees and Costs. Both of these arguments border on the frivolous. As discussed below, because § 1301.21, by its express terms, governs only commercial lending transactions, the limitation the statute places on the recovery of attorney fees—permitting recovery only in transactions in which original indebtedness exceeds $100,000—is not applicable here. Chase's equitable estoppel argument is equally unavailing. The Court may not—under the guise of doing equity—disregard the dictates of the Bankruptcy Code and state law in order to reach a result that Chase deems fair.

Finally, the Court concludes that the Costs are recoverable as a component of Chase's Arrearage Claim. Recovery of the Costs—incurred for title work done by Chase's legal counsel in connection with the state court foreclosure action—is authorized by the Mortgage and not prohibited by Ohio law. Because the nature of the service provided—rather than the identity of the service provider—should determine how a charge is characterized, the Court rejects the Debtor's contention that the Costs (which were incurred for routine pre-foreclosure title work that may, but need not, be done by an attorney) are, in fact, disguised attorney fees.

**B.      Burden of Proof**

A proof of claim executed and filed in accordance with the Federal Rules of Bankruptcy

Procedure constitutes prima facie evidence of the validity and amount of the claim.  *See Morton v.*

*Morton (In re Morton)*, 298 B.R. 301, 307 (B.A.P. 6th Cir. 2003) (citing Fed. R. Bankr. P. 3001(f)).

A debtor has the initial burden of making a colorable challenge to a properly filed proof of claim.

Once the debtor has met this burden, the burden of going forward shifts to the creditor, and the

creditor bears the ultimate burden of persuasion.  *Id.* (citation omitted).  *See also In re Leatherland*

*Corp.*, 302 B.R. 250, 258–59 (Bankr. N.D. Ohio 2003) ("When an objection is filed, the objecting

party bears the initial burden of producing sufficient evidence to rebut the presumption of validity

given to the claim.  The burden then shifts to the claimant to prove the validity and amount of the

claim by a preponderance of the evidence.  While the burden of going forward shifts during the

claims objection process, the ultimate burden of persuasion is always on the claimant to prove the

claimed entitlement.") (citations omitted).

Here, the Debtor has made a valid challenge to the Arrearage Claim based upon his assertion

that the Common Law Rule bars recovery of the Fees and Costs, thus shifting the burden of going

forward to Chase.  As discussed below, Chase has not met its ultimate burden of persuasion with

respect to the Fees but has demonstrated that the Costs are recoverable.

**C.      Applying § 1322(e)'s Decisional Framework**

Section 1322(b)(5) of the Bankruptcy Code, which authorizes a Chapter 13 debtor to cure

defaults on long-term debts, provides:

> (b) . . . the plan may—
> (5) . . . provide for the curing of any default within a
> reasonable time and maintenance of payments while
> the case is pending on any unsecured claim or secured

> claim on which the last payment is due after the date
> on which the final payment under the plan is due[.]

11 U.S.C. § 1322(b)(5).  Under § 1322(e) of the Code, "the amount necessary to cure the default

shall be determined in accordance with the underlying agreement and applicable nonbankruptcy

law." 11 U.S.C. § 1322(e).[5]  *See Lake*, 245 B.R. at 285 ( "The amount of th[e] cure is determined

by looking to two sources: (1) the existing agreement between the parties; and (2) applicable

nonbankruptcy law, which in this case is Ohio law.  As a result, '[t]wo conditions must be met

before interest or other charges can be require[d] as part of the bankruptcy cure.  First, the interest

or other charges must be required under the original agreement, and second, they cannot be

prohibited by state law.'")  (quoting *In re Bumgarner*, 225 B.R. 327, 328 (Bankr. D.S.C. 1998)).

*See also In re Koster*, 294 B.R. 737, 739–40 (Bankr. E.D. Mo. 2003) ("The analysis of Section

1322(e) is a two part process.  First, as a threshold matter, the amount necessary to cure must be in

accordance with the parties' agreement.  Second, the amount sought to be included must not

otherwise be forbidden by applicable, non-bankruptcy law.  Section 1322(e) does not provide for

the inclusion of an item in an arrearage claim that would be permitted under applicable non-

bankruptcy law that was not included in the underlying agreement."); *In re Plant*, 288 B.R. 635, 642

(Bankr. D. Mass. 2003); *Landrum*, 267 B.R. at 580 (same); *In re Hoover*, 254 B.R. 492, 496 (Bankr.

N.D. Okla. 2000) (holding that, although applicable non-bankruptcy law would allow interest on

unpaid installment arrears, the parties' agreement did not provide for interest; and that because the

agreement provided for interest on money advanced for insurance, and such interest was not

otherwise prohibited by non-bankruptcy law, its allowance was permitted under § 1322(e)).

---

[5]Although neither the Note nor Mortgage specifies a governing state law, the parties agree
that Ohio law controls.

### 1.    The Underlying Agreement

There is no dispute that the Mortgage authorizes Chase to recover its Fees and Costs in the event of the Debtor's default.  *See* Mortgage, §§ 9, 14 and 22.  Nor is there a dispute that the Tudors defaulted on the Mortgage, thus prompting the filing of the pre-bankruptcy foreclosure action in which the challenged Prepetition Fees and Costs were incurred. Section 9 of the Mortgage also provides that Chase may collect from the borrower any attorney fees required to protect "its secured position in a bankruptcy proceeding."  Mortgage, § 9.  In addition to the Default Provisions, the Mortgage also contains the Reinstatement Provision, which conditions contractual reinstatement of the mortgage upon the borrower's payment of Chase's attorney fees and costs.  There is no question, then, that the Mortgage—i.e., "the underlying agreement" referenced by § 1322(e)—allows Chase's recovery of the challenged Fees and Costs.

### 2.    Applicable Nonbankruptcy Law

As noted above, the Debtor argues that Chase's recovery of the Fees and Costs is barred by Ohio statute—Ohio Revised Code § 1301.21—and common law.  Each of these asserted bases for disallowance of the Fees and Costs is addressed below.

### (a)    Ohio Revised Code § 1301.21

The Debtor argues that the Mortgage's attorney fee provisions "*[m]ay* [n]ot [b]e [e]nforceable [p]ursuant to Ohio [Revised Code] § 1301.21." Debtor's Supp. Mem. at 17 (emphasis added).  Section 1301.21 provides, in relevant part, as follows:

> **§ 1301.21 Enforcement of commitment to pay attorneys'**
> **fees in commercial contract of indebtedness.**
>
> (A) As used in this section:
> (1) "Contract of indebtedness" means a note, bond, mortgage, conditional sale contract, retail installment contract, lease, security

agreement, or other written evidence of indebtedness, other than indebtedness incurred for purposes that are primarily personal, family, or household.

(2) "Commitment to pay attorneys' fees" means an obligation to pay attorneys' fees that arises in connection with the enforcement of a contract of indebtedness.

(3) "Maturity of the debt" includes maturity upon default or otherwise.

(B) If a contract of indebtedness includes a commitment to pay attorneys' fees, and if the contract is enforced through judicial proceedings or otherwise after maturity of the debt, a person that has the right to recover attorneys' fees under the commitment, at the option of that person, may recover attorneys' fees in accordance with the commitment, to the extent that the commitment is enforceable under divisions (C) and (D) of this section.

(C) A commitment to pay attorneys' fees is enforceable under this section only if the total amount owed on the contract of indebtedness at the time the contract was entered into exceeds one hundred thousand dollars.

(D) A commitment to pay attorneys' fees is enforceable only to the extent that it obligates payment of a reasonable amount. . . .

Ohio Rev. Code Ann. § 1301.21 (LexisNexis 2002).  Although the statute expressly refers only to

attorney fees provisions in commercial contracts—i.e., contracts in which indebtedness is "incurred

[other than] for purposes that are primarily personal, family or household"—the Debtor argues that

§ 1301.21 *may* apply to his mortgage transaction with Chase.  *See* Debtor's Supp. Mem. at 19.

To bolster his argument that residential mortgage transactions may fall within the ambit of

the statute, the Debtor directs the Court to Ohio Revised Code § 1.42, which provides that Ohio

statutory provisions "shall be read in context and construed according to the rules of grammar and

common usage."  Ohio Rev. Code Ann § 1.42 (LexisNexis 2004).  If the statute is construed

according to accepted rules of grammar and usage, the Debtor asserts, it must be read as applying

both to commercial and residential mortgage transactions.  Specifically, the Debtor argues:

In construing § 1301.21, a grammatical diagram is . . . useful.
"Contract of indebtedness" the noun and subject of the sentence is

16

followed by the verb "means" which is followed by a series of objects (e.g., "note, bond, mortgage, conditional sale contract, retail installment contract, lease, security agreement or other written evidence of indebtedness . . .") each of which, according to common usage, is a value-equivalent of the subject. The last item in the series – "other written evidence of indebtedness" is a "catchall" category. The sentence concludes with a prepositional phrase "other than indebtedness incurred for purposes that are primarily personal, family or household." What this phrase modifies is not clear. In determining the meaning of this statute, the question is whether this phrase is intended by the legislature to qualify the last item in the series ("other written evidence of indebtedness") or the entire series.

. . . .

Debtor's position is that the definition for a "contract of indebtedness" under § 1301.21(A) includes all notes, bonds mortgages conditional sale contracts, retail installment contracts, leases and security agreements and other written evidence of indebtedness of any kind except that if the contract is something other than a note, bond, mortgage, conditional sale contract, retail installment contract, lease or security agreement (in other words, if it is "other written evidence of indebtedness") then in that case, it must be a contract that was incurred for purposes that are primarily personal family or household.

One reason Debtor urges this construction is because the list of indebtedness contracts set forth in the statute includes "retail installment contracts". Commercial contracts in the strictest sense of the word are seldom "retail".  Retail installment sales must, by definition, be "retail" and the vast majority of such contracts likely involve purchases such as automobiles, furniture, or other consumer goods. Debtor can envision few circumstances in which a retail installment sale is not primarily for personal, family or household purposes.

Debtor's Supp. Mem. at 20–22.

In support of the interpretation of § 1301.21 he urges the Court to adopt, the Debtor cites the following general—and somewhat amorphous—rule of grammar: "The correct use of modifiers is a matter of common sense. Whatever modifiers are used in a sentence, they must be placed so that they relate clearly to the words they modify." *Id*. at 20 (quoting John L. Maroon, *Writer's Review,*

17

*A Manual for College Writers,* Chapter 13, "The Use of Modifiers," at 145 (Scott, Foresman and

Company, 1968)).  The Debtor's reliance on grammatical principles to support his interpretation of

§ 1301.21 is misplaced.  Because the statute is clear and unambiguous, the Court need not look to

rules of statutory construction to determine its meaning.  *See State v. Hurd*, 734 N.E.2d 365, 366

(Ohio 2000) ("When a statute is plain and unambiguous . . . there is no occasion for resorting to

rules of statutory interpretation.") (citations and internal quotation marks omitted); *State ex rel.*

*Savarese v. Buckeye Local Sch. Dist. Bd. of Educ.*, 660 N.E.2d 463, 465 (Ohio 1996) ("If the

meaning of the state statute is unambiguous and definite, it must be applied as written and no further

interpretation is necessary.").[6]  And because § 1301.21's plain language, including its title, make

clear that it governs only commercial—and not residential—lending transactions, the Court need

not parse the statute's language or analyze its grammatical structure and punctuation in order to

divine legislative intent.[7]  But even if the Court were to find that § 1301.21 is ambiguous, the

grammatical argument advanced by the Debtor does not establish that his reading of the statute is

correct.  Indeed, the construction of the statute the Debtor asks the Court to adopt would actually

violate an accepted rule of grammar—the so-called doctrine of the last antecedent.  Hence, as

---

[6]Federal courts interpret state laws according to state rules of statutory construction.  *See Ward v. Utah*, 398 F.3d 1239, 1248 (10th Cir. 2005); *Neilson v. Chang (In re First T.D. & Inv., Inc.)*, 253 F.3d 520, 527 (9th Cir. 2001).

[7]Ohio courts look to a statute's title to ascertain legislative purpose and intent.  *See Commercial Credit Co. v. Schreyer*, 166 N.E. 808, 810 (Ohio 1929); *State v. Glass*, 273 N.E.2d 893, 895–96 (Ohio Ct. App. 1971) ("Consideration of the [statute's] title is especially proper where, as in Ohio, . . . there is a constitutional provision that no bill shall contain more than one subject, which shall be clearly expressed in the title.").  The title of Ohio Revised Code § 1301.21, which refers to the enforceability of attorney fee provisions in a "commercial contract of indebtedness," *see* Ohio Rev. Code Ann. § 1301.21, makes clear that the statute applies to commercial, rather than residential, debt instruments.

18

explained below, an analysis of the grammatical structure and punctuation of § 1301.21 undercuts,

rather than supports, Debtor's contention that the statute's reach extends beyond commercial debt

transactions.

"[T]he natural starting point in construing the effect of any modifying clause in a statute is

by reference to standard rules of grammar." *In re Munro*, 282 B.R. 841, 844 (Bankr. N.D. Ohio

2002) (citing *State ex rel. Antonucci v. Youngstown City Sch. Dist. Bd. of Educ.*, 722 N.E.2d 69, 71

(Ohio 2000)).  The bankruptcy court in *Munro* explained the last antecedent rule, which has been

applied by Ohio courts as an interpretative tool, *see, e.g.*, *Indep. Ins. Agents of Ohio v. Fabe*, 587

N.E.2d 814, 817 (Ohio 1992); *Carter v. Youngstown*, 65 N.E.2d 63, 66 (Ohio 1946), stating:

> Under the standard rules of grammar, the effect of a modifying clause
> on the preceding phrase(s) is generally dependent on the presence or
> lack of a separating comma. In this respect, the lack of a comma will,
> in most instances, involve the application of the principle of statutory
> construction known as the rule of the last antecedent, which, as its
> name implies, holds that where one phrase of a statute modifies
> another, the modifying phrase applies only to the phrase immediately
> preceding it. . . .  By comparison, when a comma is placed between
> the modifying clause and the phrase(s) immediately preceding it, the
> general rule of statutory construction holds that the qualifying phrase
> applies not just to the phrase immediately preceding it, but instead to
> all of the antecedent[ ] phrases.

282 B.R. at 844 (citations omitted).  *See also Elliot Coal Mining Co., Inc. v. Dir., Office of Workers*

*Comp. Programs*, 17 F.3d 616, 630 (3d Cir. 1994) ("[U]se of a comma to set off a modifying phrase

from other clauses indicates that the qualifying language is to be applied to all of the previous

phrases and not merely the immediately preceding phrase."); *Nat'l Sur. Corp. v. Midland Bank*, 551

F.2d 21, 34 (3d Cir. 1977) (holding that statute's limiting language applied only to the word

immediately preceding it in absence of comma).

19

Application of the rule of the last antecedent to the statutory text of § 1301.21 demonstrates that Debtor's strained reading of the statute is incorrect.  The placement of a comma before the modifying phrase "other than indebtedness incurred for purposes that are primarily personal, family, or household" suggests that the phrase applies to all of the items in the series preceding it—"note, bond, mortgage, conditional sale contract, retail installment contract, lease, security agreement, or other written evidence of indebtedness"—and not simply the last item in the series immediately preceding the qualifying clause—"or other written evidence of indebtedness."  Thus, interpreting the "words and phrases used [§ 1301.21] . . . in context and . . . according to the rules of grammar and common usage," *see* Ohio Rev. Code Ann. § 1.42; *Antonucci*, 722 N.E.2d at 71, leads to the inescapable conclusion that the statute applies only to commercial, and not residential, lending transactions.[8]

---

[8]The Court has undertaken this grammatical exercise in order to address, and refute, Debtor's contention that his proposed construction of § 1301.21 is supported by rules of grammar and common usage.  Yet, the Court is mindful of the fact that grammar and punctuation often are not reliable guides to statutory construction.  As the United States Supreme Court explained in *United States National Bank of Oregon v. Independent Insurance Agents of America, Inc.*, 508 U.S. 439 (1993),

> the meaning of a statute will typically heed the commands of its punctuation. But a purported plain-meaning analysis based only on punctuation is necessarily incomplete and runs the risk of distorting a statute's true meaning. Along with punctuation, text consists of words living a communal existence, in Judge Learned Hand's phrase, the meaning of each word informing the others and all in their aggregate taking their purport from the setting in which they are used. Over and over we have stressed that in expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provisions of the whole law, and to its object and policy. No more than isolated words or sentences is punctuation alone a reliable guide for discovery of a statute's meaning. Statutory construction is

Debtor's proposed construction of § 1301.21 is not only based on a faulty grammatical premise, it also would produce an absurd result.  Under the Debtor's reading of the statute, a creditor could collect attorney fees in a non-commercial lending transaction exceeding $100,000 if the transaction was initiated by the execution of a "note, bond, mortgage, conditional sale contract, retail installment contract, lease, [or] security agreement," but could not do so if the borrower instead signed some "other written evidence of indebtedness."  Because the Ohio legislature could not have intended such an utterly illogical result, the Court must reject the nonsensical interpretation of § 1301.21 offered by the Debtor.  *See* Ohio Rev. Code Ann. § 1.47 (LexisNexis 2004) ("In enacting a statute, it is presumed that . . . [a] just and reasonable result is intended; . . . ."); *Mishr v. Bd. of Zoning Appeals*, 667 N.E.2d 365, 367 (Ohio 1996) ("It is a cardinal rule of statutory construction that a statute should not be interpreted to yield an absurd result."); *State ex rel. Dispatch Printing*

---

a holistic endeavor, and, at a minimum, must account for a statute's full text, language as well as punctuation, structure, and subject matter.

*Id.* at 454–55 (alterations, citations and  internal quotation marks omitted).  *See also United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 250 (1989) ("[T]he Court has not hesitated in the past to change or ignore punctuation in legislation in order to effectuate congressional intent."); *United States v. Bass*, 404 U.S. 336, 340 n.6 (1971) (declining to apply last antecedent doctrine, and stating: "[M]any leading grammarians, while sometimes noting that commas at the end of a series can avoid ambiguity, concede that use of such commas is discretionary. When grammarians are divided, and surely where they are cheerfully tolerant, we will not attach significance to an omitted comma. It is enough to say that the statute's punctuation is fully consistent with the respondent's interpretation, and that in this case grammatical expertise will not help to clarify the statute's meaning.") (citations omitted); *Egyptian Supply Co. v. Boyd (In re Graves)*, 117 F.2d 608, 611 (6th Cir. 1941) ("punctuation is a fallible standard of the meaning of a statute and is resorted to only as a last resort in construing doubtful statutes"); *Albright v. Payne*, 1 N.E. 16, 20 (Ohio 1885) (noting that "[p]unctuation may aid in arriving at the meaning of a statute, but does not control" and observing that "[p]unctuation is a most fallible standard by which to interpret a writing") (quoting *Ewing v. Burnett*, 36 U.S. 41, 54 (1837)).

*Co. v. Wells*, 481 N.E.2d 632, 634 (Ohio 1985) ("It is an axiom of judicial interpretation that statutes

be construed to avoid unreasonable or absurd consequences.").

Turning to the next argument advanced by the Debtor, the Court concludes that § 1301.21's

inclusion of "retail installment contract[s]" within the list of "contract[s] of indebtedness" covered

by the statute does not suggest that § 1301.21 was intended to regulate non-commercial lending

transactions.  Noting that "the vast majority of [retail installment contracts] likely involve purchases

such as automobiles, furniture, or other consumer goods," the Debtor points out that "[c]ommercial

contracts are seldom 'retail.'" Debtor's Supp. Mem. at 22.  But while the vast majority of retail

installment contracts do indeed involve consumer purchases, the language of the Ohio Retail

Installment Sale Act (Ohio Rev. Code Ann. §§ 1317.01–1317.99 (LexisNexis 2002)) is broad

enough to encompass certain non-consumer transactions.  As defined in the Ohio Revised Code, the

phrase "retail installment sale" includes "every retail sale of specific goods to any *person*."  Ohio

Rev. Code Ann. § 1317.01(A) (emphasis added).    "Person" is defined as "an individual,

corporation, trust, partnership of two or more persons having a joint or common interest, and any

other association."  Ohio Rev. Code Ann. § 1317.01(B).  And "consumer transaction[s]"—defined

as a transaction with "an individual for purposes that are primarily personal, family, or household,"

*see* Ohio Rev. Code Ann. § 1317.01(P)—are but one category of transactions falling within Ohio

Revised Code § 1317.01(A)'s broad definition of "retail installment sale."  Thus, while rare,

installment sale contracts executed by and between two business entities may fall within the broad

definition of retail installment sale contained in Ohio Revised Code § 1317.01(A).  The reference

to retail installment contracts contained in Ohio Revised Code § 1301.21 accordingly does not

22

suggest a legislative intent to include non-commercial lending transactions within the ambit of the statute.

Finally, the Debtor argues that language contained in a footnote found in *Dollar Bank v. Petroff (In re Petroff)*, 2001 WL 34041797 (B.A.P. 6th Cir. July 25, 2001)—an unreported decision from the Sixth Circuit Bankruptcy Appellate Panel ("BAP")—supports his assertion that Ohio Revised Code § 1301.21's attorney fee limitation applies to residential lending transactions. The Court disagrees. In footnote one of the *Petroff* decision, the BAP noted that the Common Law Rule "has recently been abrogated by statute, but only as to cases wherein the total contract indebtedness exceeds $100,000." *Petroff*, 2001 WL 34041797, at *3 n.1. This language from *Petroff* is mere dicta: the BAP was not called upon to interpret Ohio Revised Code § 1301.21 or determine the scope of the statute in that case. Thus, *Petroff's* passing reference to § 1301.21, and the BAP's mistaken observation about the reach of the newly enacted provision—made in a case in which the statute was not in issue—fails to convince the Court that the Debtor's interpretation of § 1301.21 is correct.

In sum, although the Debtor tries mightily to find ambiguity in the text of Ohio Revised Code § 1301.21 where none exists, the Court concludes that the statute expressly covers only commercial—and not residential—contracts of indebtedness. Because the statute's restriction on the recovery of attorney fees—limiting recovery to contracts in which the total debt incurred exceeds $100,000—is not applicable to the Mortgage, it does not provide a basis for disallowance of the Fees.

23

(b)     **The Common Law Rule**

(i)     **General Principles**

Ohio courts recognize only limited exceptions to the so-called "American rule," which requires all litigants to pay their own legal fees, regardless of the outcome of a case.  For example, Ohio law does not permit the recovery of attorney fees as damages in tort actions, except where there is evidence of actual fraud with scienter and/or actual malice sufficient to sustain an award of punitive damages. *See Zoppo v. Homestead Ins. Co.*, 644 N.E.2d 397, 402 (Ohio 1994); *Columbus Fin., Inc. v. Howard*, 327 N.E.2d 654, 658 (Ohio 1975).  In contract actions, Ohio courts have generally not permitted recovery of attorney fees unless: (1) a statute requires payment of the fees; (2) the losing party or opposing counsel acted in bad faith; or (3) the parties agreed contractually to shift the fees.  *See Scotts Co. v. Cent. Garden & Pet Co.*, 256 F. Supp. 2d 734, 748 (S.D. Ohio 2003); *Colonel's Inc. v. Cincinnati Milacron Mktg. Co.*, 1998 WL 321061, at *4 (6th Cir. June 1, 1998); *McConnell v. Hunt Sports Enters.*, 725 N.E.2d 1193, 1223 (Ohio Ct. App. 1999).

While contractual fee-shifting is authorized under certain circumstances, as discussed above, Ohio courts have long held that contractual provisions in mortgages and certain other debt instruments stipulating that a defaulting borrower is responsible for the lender's attorney fees are unenforceable.  Indeed, for well over a century, Ohio courts have held that contract provisions in debt instruments awarding attorney fees to the lender in the event of a default by the borrower are void as against public policy.  In 1841, the Ohio Supreme Court first ruled that contractual stipulations for the payment of attorney fees "are against the public policy of the country, and ought not to be enforced in courts of justice."  *State v. Taylor*, 10 Ohio 378, 381 (1841).  The *Taylor* court described a contract stipulation where the "borrower should pay the expenses of collection" as one

24

for which the "brokers in this state would hold a general jubilee" and that such stipulations, if

allowed, would create a "means of a legalized extortion." *Id.* at 381.  Later, in *Leavens v. Ohio*

*National Bank*, 34 N.E. 1089 (Ohio 1893), the Ohio Supreme Court reviewed a mortgage note

provision allowing the mortgagee to include reasonable attorney fees, as fixed by the court, in a

foreclosure decree in the event of a default.  The court found the attorney fee provision to be

unenforceable, holding that "a stipulation in a mortgage to the effect that, in case an action should

be brought to foreclose it, a reasonable attorney fee, to be fixed by the court . . . should be included

in the decree . . . is against public policy and void." *Id.* at paragraph 1 of syllabus.[9]

  **(ii)**  *Miller v. Kyle*

  In *Miller*, the Ohio Supreme Court reaffirmed the longstanding rule that "contracts for the

payment of counsel fees upon default in payment of a debt will not be enforced." *Miller,* 97 N.E.

at 372.  There, the court considered former Ohio General Code §§ 8106 and 8107—two provisions

contained in a 1902 uniform act governing negotiable instruments (a predecessor to the Uniform

Commercial Code).  One of the statutes in question—former Ohio General Code § 8107—provided

that a note was negotiable if the "sum payable" included, among other things, "costs of collection

or an attorney's fee in case payment shall not be made at maturity." *Miller*, 97 N.E. at 373 (quoting

former Ohio. Gen. Code § 8107). The appellant in *Miller* argued that passage of this statute had

---

[9]Previously, a holding of the Ohio Supreme Court was contained only in the syllabus of the decision and the remaining portions of the decision were deemed to be dicta.  *See Roberds, Inc. v. Broyhill Furniture (In re Roberds, Inc.)*, 313 B.R. 732, 737 (Bankr. S.D. Ohio 2004); *State ex rel. Heck v. Kessler*, 647 N.E.2d 792, 797 (Ohio 1995).  Under recent amendments to the Supreme Court Rules for the Reporting of Opinions (effective May 1, 2002), a holding is contained in the syllabus of the opinion (if one is provided) and in the text, including footnotes.  If a conflict exists between the syllabus and the text or footnotes, the syllabus controls.  *See* Supreme Court Rules for the Reporting of Decisions 1(B)(1) and (2); *Roberds*, 313 B.R. at 738 n.2; *State v. Davis*, 2004 WL 1486327, at *11 (Ohio Ct. App. June 14, 2004).

abrogated the Common Law Rule.  The *Miller* court disagreed, construing the statutory language narrowly and holding that former Ohio General Code § 8107 was not intended to overturn the Common Law Rule, but instead simply to provide that inclusion of attorney fee provisions in promissory notes did not "destroy[]. . .[their] negotiable character."  *Id.* at 373.  The court in *Miller* reasoned that the "General Assembly may b[y] legislative enactment change the common-law policy of the state," but "statutes in derogation of the common law shall not by construction receive a meaning beyond that of the terms which they employ."  *Id.*

Based on *Miller*, bankruptcy courts applying Ohio law have consistently held that attorney fee provisions in debt instruments are void as against public policy and, thus, attorney fees are not a proper component of a mortgagee's arrearage claim in a Chapter 13 case.  *See, e.g., Petroff*, 2001 WL 34041797, at *1; *In re Shaffer*, 287 B.R. 898, 901–02 (Bankr. S.D. Ohio 2002); *Landrum*, 267 B.R. at 582; *Lake*, 245 B.R. at 286; *In re Foreman*, 119 B.R. 584, 588 (Bankr. S. D. Ohio 1990); *In re Simons*, 119 B.R. 589, 593–94 (Bankr. S.D. Ohio 1990).  Several of the foregoing cases hold that the Common Law Rule invalidates all attorney fee stipulations in debt instruments—both default-based provisions and those that require the payment of attorney fees as a condition of contractual reinstatement.  *See Landrum*, 267 B.R. at 582–83; *Lake*, 245 B.R. at 286–87.  As discussed below, other courts have drawn a distinction between default-based attorney fee provisions and contractual stipulations requiring the payment of fees as a condition of mortgage reinstatement, holding that the latter are not contrary to public policy and are enforceable.  *See Davidson*, 285 F. Supp. 2d at 1097–1103; *Mahaffey*, 796 N.E.2d at 44–45.

26

(c)        **Exceptions to the Common Law Rule**

(i)        **Freely Negotiated Agreements Between Parties
With Equal Bargaining Power**

In 1987 the Ohio Supreme Court decided two cases that qualified, but did not overturn, the

Common Law Rule.  In *Worth v. Aetna Casualty & Surety Co.*, 513 N.E.2d 253 (Ohio 1987), the

court, in a unanimous decision, upheld *Miller*, but found it inapplicable where an attorney fee

provision in a sophisticated indemnification agreement was arrived at through "free and

understanding negotiation."  *Id.* at 257–58.  The court, however, specifically distinguished

negotiated agreements from ordinary debt instruments:

> When a stipulation to pay attorney fees is incorporated into an
> ordinary contract, lease, note or other debt instrument, it is ordinarily
> included by the creditor or a similar party to whom the debt is owed
> and is in the sole interest of such party.  In the event of a breach or
> other default on the underlying obligation, the stipulation to pay
> attorney fees operates as a penalty to the defaulting party and
> encourages litigation to establish either a breach of the agreement or
> a default on the obligation.  In those circumstances, the promise to
> pay counsel fees is not arrived at through free and understanding
> negotiation.

*Id.*  Notably, the stipulation of attorney fees in the *Worth* contract favored appellants, two executives

who had entered into a contract with their employer during a time period when a change of corporate

control appeared imminent.  *Id.*  Distinguishing the unique fact pattern in *Worth* from earlier cases

involving typical debt instruments, the court stated that "our decision today leaves undisturbed our

holding in *Miller v. Kyle*, *supra*, and like cases."  *Id.* at 258.

A month later, a divided Ohio Supreme court again distinguished *Miller* when it decided

*Nottingdale Homeowners' Ass'n v. Darby*, 514 N.E.2d 702 (Ohio 1987).  The *Nottingdale* court

upheld the trial court's award of attorney fees in a contract dispute between condominium owners

and the condominium owners' association.   In *Nottingdale,* the condominium association's declaration and bylaws contained provisions for the payment of attorney fees in the event of a successful collection or foreclosure action against condominium owners.   *Id.* at 703 n.3.   In exempting the fee stipulation from the Common Law Rule, the court characterized the condominium owners and the owners' association as "competent parties with equal bargaining positions and under neither compulsion nor duress."   *Id.* at 705.   As in *Worth*, the court in *Nottingdale* upheld the challenged attorney fee provision based on the parties' equality of bargaining position, contrasting the *Nottingdale* fact pattern with that presented in *Miller*—inclusion of an attorney fee provision in a standard debt instrument.   *See id.*

Ohio courts generally have read   *Nottingdale* narrowly, concluding that it leaves the Common Law Rule intact.   *See, e.g., Sabin v. Ansorge*, 2000 WL 1774141, at *4 (Ohio Ct. App. Dec. 1, 2000)   ("*Nottingdale* did not change the common law, but simply carved out an exception to the [*Miller*] rule that provisions for attorney fees are unenforceable.") (citing *CIT Group/Equip. Fin., Inc. v. New GIFL, Inc.*, 823 F. Supp. 479, 487 (N.D. Ohio 1993)) (other citations omitted). And federal courts applying Ohio law—including Ohio bankruptcy courts—also have concluded that *Worth* and *Nottingdale* have not abrogated the Common Law Rule.   *See, e.g., Colonel's Inc.,* 1998 WL 321061, at *5 ("Although *Worth* and *Nottingdale* recognize that where specifically contracted for, attorney fee provisions should be enforced, these cases do not change the general common law rule of unenforceability."); *Shaffer*, 287 B.R. at 901 n.5 (refusing, based on the Common Law Rule to award attorney fees to secured creditor in foreclosure action in Chapter 13); *Star Bank, N.A. v. Reveal (In re Reveal)*, 148 B.R. 288, 292 (Bankr. S.D. Ohio 1992) ("Ohio law continues to prohibit stipulations in promissory notes requiring payment of attorney fees. . . ."). *But see In re Barcelli,*

270 B.R. 837, 841 (Bankr. S.D. Ohio 2001) (following *Nottingdale* in finding a claim for attorney

fees valid when made by a condominium association according to a contractual stipulation).

(ii)    **The Reinstatement Exception**

As previously noted, at least two courts have recognized a reinstatement exception to the

Common Law Rule, holding that contractual provisions allowing for a mortgage holder's recovery

of attorney fees where a debtor exercises a contractual right of mortgage reinstatement following

default are not violative of public policy. *See Davidson*, 285 F. Supp. 2d at 1097–1103; *Mahaffey*,

796 N.E.2d at 44–45. In *Davidson,* a putative class action in which the plaintiff alleged that the

defendant's attempted collection of attorney fees incurred in a foreclosure action violated the Fair

Debt Collection Practices Act and Ohio law, Judge Rice concluded that a mortgage provision calling

for the payment of attorney fees upon reinstatement was enforceable. *See id.* at 1102–03.  The

*Davidson* court drew a distinction between default-based attorney fee provisions and those triggered

by a borrower's exercise of a contractual right of mortgage reinstatement, explaining:

> [U]pon default, the mortgagor has no obligation to seek reinstatement
> of his mortgage.  To the contrary, she may, *inter alia*, decide to allow
> the foreclosure proceedings to continue and to avail herself of the
> remedies available through that proceeding.  Thus, the reinstatement
> provision in the mortgage creates no obligation to pay attorney's fees
> *upon default*.  Consequently, the payment of attorney's fees as a
> condition of reinstatement does not implicate the public policy
> concern in *Miller* regarding the imposition of a penalty against the
> debtor upon default and its concern with usury.
>
> Stated simply, under the current state of Ohio law, agreements to pay
> attorney's fees are not void under any and all circumstances.  To the
> contrary, the Ohio Supreme Court has recognized the right of
> individuals to agree to pay other's attorney's fees, even in the context
> of default or breach of contract, although with some limitations.
> Assuming the continued viability of *Miller*, Defendant has made the
> payment of its reasonable attorney's fees a condition of

29

reinstatement, not of default.  Thus, those fees are permissible under
Ohio law.

*Id.* (citations omitted).

The *Davidson* court followed the Ohio Court of Appeals decision in *Mahaffey*.  There, in a foreclosure case, the court permitted the mortgagee to collect its attorney fees because the payment obligation was "merely a condition of reinstatement, not an obligation that arises in connection with the enforcement of the contract."  796 N.E.2d at 45.  The *Mahaffey* court found "nothing against public policy in imposing the requirement of the payment of attorney fees expended in foreclosure proceedings as a condition of reinstatement of a mortgage loan."  *Id.*  Thus, *Davidson* and *Mahaffey* hinge on the reasoning that attorney fee stipulations conditioning payment on the exercise of a contractual right of reinstatement—like the Reinstatement Provision contained in the Mortgage—do not automatically penalize a borrower's default, but instead impose a charge for exercising a noncompulsory contractual right.

### (d)    The Exceptions to the Common Law Rule Do Not Apply

Chase argues that the Common Law Rule does not operate to nullify the attorney fee provisions in the Mortgage for two reasons.  First, Chase contends that because the Debtor has not proven a disparity in bargaining power between the parties, the Common Law Rule is not applicable.  Second, even assuming that the Common Law Rule applies and renders the Default Provisions unenforceable, Chase maintains that the reinstatement exception recognized by the *Davidson* and *Mahaffey* courts provides a basis for its collection of the Fees.  Neither argument is persuasive.

### (i)        Inequality of Bargaining Power

Chase points out—and the Debtor does not dispute—that the Stipulation fails to address the issue of the relative bargaining power of Chase and the Tudors. Because no evidence was offered establishing inequality of bargaining power between the parties, Chase argues that the Debtor may not rely on the Common Law Rule as a basis for disallowance of the Fees and Costs.

Chase's argument is based on a faulty premise—that before the Debtor can invoke the Common Law Rule he must first make an evidentiary showing that the parties did not have equal bargaining power at the time the Mortgage was executed. However, because the Common Law Rule presumes unequal bargaining power in the context of an ordinary loan transaction between a consumer borrower and a commercial lender, it was not necessary for the Debtor to offer evidence establishing inequality of bargaining position. As the Ohio Supreme Court put it in *Worth*, "[w]hen a stipulation is incorporated into an ordinary contract, lease, note or other debt instrument, it is ordinarily included by the creditor or a similar party to whom the debt is owed and is in the sole interest of such party." *Worth*, 513 N.E.2d at 257–58. Ohio courts assume that "[i]n those circumstances, the promise to pay counsel fees is not arrived at through free and understanding negotiation." *Id.* at 258. *See also Vermeer of S. Ohio v. Argo Constr. Co., Inc.*, 760 N.E.2d 1, 6 (Ohio Ct. App. 2001) ("[T]he general rule against fee-shifting agreements remains, and a court may enforce a party's contractual agreement to pay, as a cost of enforcing the contract, the attorney fees of the other party only when, upon consideration of the underlying circumstances, the agreement to pay the fees can fairly be said to be the product of a free and understanding negotiation . . . between parties of equal bargaining power and similar sophistication.") (citations and internal quotation marks omitted); *Sabin*, 2000 WL 1774141, at *4 ("While . . . the trend indicated by *Nottingdale* is

towards an emphasis on the relative bargaining power of the parties to the contract in determining the legitimacy of such provisions, this court believes that the prohibition against the enforcement of provisions for attorney fees in debt instruments propounded in *Miller* is still the law in Ohio."). So, to overcome the presumption underlying the Common Law Rule—the inherent lack of equal bargaining position in the context of a loan from commercial lender to consumer borrower—Chase had the burden of showing that the attorney fee provisions in the Mortgage were the product of free and understanding negotiations between two equally sophisticated parties. *See Worth*, 513 N.E.2d at 258; *Vermeer*, 760 N.E.2d at 6. To hold, as Chase argues, that the Debtor had the burden of proving inequality of bargaining power, would stand the Common Law Rule on its head.

Requiring the Debtor to prove unequal bargaining power also would disregard the allocation of pleading and proof in claim litigation. As discussed *supra* at 13, the Debtor met his burden of overcoming the prima facie validity of Chase's Arrearage Claim by invoking the Common Law Rule as a basis for disallowance of the Fees and Costs. *See* Fed. R. Bankr. P. 3001(f); *Morton*, 298 B.R. at 307. To escape the effect of the Common Law Rule—nullification of the Mortgage's attorney fee provisions—Chase was required to demonstrate that these provisions were freely negotiated and that Chase and the Debtors had equal bargaining power. Chase attempted to make this showing by arguing that, even though it requires all prospective borrowers to execute a standard-form mortgage document to obtain home financing, government-backed lending entities Freddie Mac and Fannie Mae actually drafted the mortgage template used here to provide a standard form fair to both sides. Neither borrower nor lender, Chase argues, could have negotiated the Mortgage's provisions without destroying its transferability on the secondary mortgage market. Thus, Chase maintains that the parties do actually occupy equal bargaining positions.

32

The fact that a government-backed entity, rather than a scrivener employed by Chase, may have drafted the standard form mortgage executed by the Tudors is not enough to overcome the reality that the terms of the Mortgage were not freely negotiated.  The terms of a standard form residential mortgage are not, and were not for this Debtor, freely negotiable.  At the hearing on the Objection ("Hearing"), counsel for Chase conceded that the Mortgage executed by the Tudors was a standard, preprinted form contract.  "[P]re-printed form documents . . . by definition are not negotiated agreements." *Lake*, 245 B.R. at 287.  Chase does not actually dispute that the Tudors were unable to negotiate the terms of the form Mortgage.  Rather, Chase argues that it too was unable to bargain meaningfully because any changes by Chase to the standard form mortgage document would have prevented its sale on the secondary mortgage market.  This argument is untenable.  True, Freddie Mac and Fannie Mae require lenders to use pre-approved, standardized loan documents in order to sell their loans in the secondary mortgage market.  But it does not follow—and Chase has not shown—that Freddie Mac/Fannie Mae require that these standardized documents be drafted in a manner that fairly balances the interests of borrower and lender.  Even a cursory review of the Mortgage reveals that—with the possible exception of the Reinstatement Provision—its terms are designed primarily to protect the interest of the secured lender, and understandably so.  In short, the fact that the Mortgage was executed on a Freddie Mac/Fannie Mae-approved form does not establish that its terms were freely negotiated or that Chase and the Tudors possessed equal bargaining power.  It simply strains credulity to suggest that, in a transaction between consumer borrowers and one of the nation's largest residential mortgage lenders, the parties stood on equal footing.

In *Petroff*, the BAP described the typical residential mortgage transaction as "an ordinary case, under the [Common Law Rule], because it involves a contract of adhesion between a professional lender and an unsophisticated borrower. The documents are provided by the lender, the provisions for attorney fees are included within, those provisions favor only the lender, and the borrower is required to sign the documents or forego the deal." 2001 WL 34041797, at *2.[10] Just as in *Petroff*, the Court here is presented with "the usual case involving a note and mortgage made by an ordinary citizen in favor of a commercial lender[,]" *id.*, one that obviously falls within the ambit of the Common Law Rule. The standard form documents signed by the Debtor contain attorney fee provisions that favor only Chase. Further, its very format, with multiple pages of boilerplate provisions set forth in minuscule print, reinforces the Debtor's contention that Chase would not negotiate the terms of the Mortgage, regardless of who drafted it, a contention that Chase did not refute at the Hearing. Hence, Chase has not persuaded the Court that the Common Law Rule is inapplicable here because it has failed to demonstrate that the Mortgage's attorney fee provisions were the product of free and understanding negotiation between parties of equal bargaining power and similar sophistication.

**(ii)    The Reinstatement Exception—Chapter 13 Cure
Versus Contractual Reinstatement**

At the heart of this contested matter is the question of whether the Debtor's cure of his Mortgage arrearage through his Chapter 13 plan is essentially equivalent to a contractual mortgage reinstatement. Chase argues that "[a]s Debtor has voluntarily filed a Chapter 13 case under

---

[10]"An adhesion contract exists when a party with little or no bargaining power is required to submit to terms to which he has no choice." *Gonzalez v. Rent-A-Center, Inc.*, 2005 WL 1353883, at *4 (N.D. Ohio June 7, 2005) (citing *Nottingdale*, 514 N.E.2d at 707 n.7). *See also Pyle v. Wells Fargo Fin.*, 2004 WL 2065652, at *4 (Ohio Ct. App. Sept. 16, 2004) (same).

11 U.S.C. [§] 301, he has sought permission of the Court under the Code to reinstate the loan[,]" Chase Resp. at 5, and "[t]he filing of a Chapter 13 Bankruptcy, and the subsequent repayment of the arrearage is, in effect, a reinstatement of the mortgage loan." Chase Supp. Mem. at 10. As explained below, however, there are essential differences between a contractual mortgage reinstatement and the statutory cure right afforded by § 1322(b)(5) of the Bankruptcy Code. The fundamental differences between these remedies compel rejection of Chase's contention that contractual mortgage reinstatement and mortgage reinstatement through a Chapter 13 plan are one and the same. Chase's reliance on the reinstatement exception to the Common Law Rule as the basis for its recovery of the Fees is therefore misplaced.

Here, in order to reinstate the Mortgage, the Tudors would have been contractually obliged to:

(a)     pay Chase all sums due under the Mortgage and Note as if no acceleration had occurred;

(b)     cure any default of any other covenants or agreements;

(c)     pay all expenses incurred in enforcing the Mortgage, including, but not limited to, reasonable attorney fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Chase's interest in the property and its rights under the Mortgage;

(d)     take any such action as Chase may reasonably require to assure that its interest in the Property and its rights under the Mortgage would continue unchanged; and

(e)     take any such action as Chase may reasonably require to assure that the Debtor's obligation to pay the sums secured by the Mortgage would continue unchanged.

Mortgage, § 19. To contractually reinstate the Mortgage, the Debtor therefore would have been required to cure all non-monetary defaults and pay Chase "all sums" necessary to bring the Note and

Mortgage current.  At a minimum, a lump-sum payment from the Debtor to Chase would have been necessary in order to cure the arrearage and reinstate the loan.

By contrast, a Chapter 13 plan may "provide for the *curing of any default within a reasonable time* and maintenance of payments while the case is pending on any unsecured claim or secured claim on which the last payment is due after the date on which the final payment under the plan is due."  11 U.S.C. § 1322(b)(5) (emphasis added).[11]  The Bankruptcy Code provides that, "[t]he plan may not provide for payments over a period that is longer than three years, unless the court, for cause, approves a longer period, but the court may not approve a period that is longer than five years."  11 U.S.C. § 1322(d).  What constitutes cure of a default within a "reasonable time" is determined on a case-by-case basis.  *See Steinacher v. Rojas (In re Steinacher)*, 283 B.R. 768, 774 n.13 (B.A.P. 9th Cir. 2002); *In re Ford*, 221 B.R. 749, 754 (Bankr. W.D. Tenn. 1998).  Courts have approved cure periods ranging from 6 months to the maximum 60-month plan duration allowed by § 1322(d).[12]  So, while the Reinstatement Provision calls for immediate lump-sum payment of an

---

[11]"Section 1322(b)(5) provides Chapter 13 debtors the opportunity to deaccelerate, cure and reinstate residential mortgages, notwithstanding § 1322(b)(2), which precludes 'modifying' the rights of secured claimants holding only a security interest in real estate that is a debtor's principal residence." *First Nat'l Bank of Damariscotta v. Sidelinger (In re Sidelinger)*, 175 B.R. 115, 117 (Bankr. D. Me. 1994) (footnote and citations omitted).  *See also In re Good*, 207 B.R. 686, 690 (Bankr. D. Idaho 1997) ("In Section 1322(b)(5), however, there is an exception to the prohibition against modifying rights of home mortgage lenders enunciated in Section 1322(b)(2).  Under Section 1322(b)(5), a debtor may 'provide [in the plan] for the curing of any default within a reasonable time and maintenance of payments while the case is pending' on a home mortgage 'notwithstanding paragraph (2) of this subsection'.") (quoting 11 U.S.C. § 1322(b)(5)).

[12]*See, e.g., In re Ford*, 221 B.R. at 754 (6-month period to cure arrearages reasonable); *In re East*, 172 B.R. 861, 867 (Bankr. S.D. Tex. 1994) (52-month period reasonable, notwithstanding the fact that "short-term" mortgage would mature before completion of payment of arrearages); *Sidelinger*, 175 B.R. at 119–20 (36-month cure reasonable); *In re Masterson*, 147 B.R. 295, 296–97 (Bankr. D.N.H. 1992) (56-month cure not unreasonable); *Cole v. Cenlar Fed. Sav. Bank (In re Cole)*, 122 B.R. 943, 951–52 (Bankr. E.D. Pa. 1992) (60-month plan to cure confirmed); *In re*

arrearage, the cure remedy available in a Chapter 13 provides that an arrearage may be paid off over time. "That is, the debtor can have his . . . repayment spread over several payments rather than having to repay in one lump sum." *In re Capps*, 71 B.R. 592, 593 (E.D. Pa.), *aff'd*, 836 F.2d 773 (3d. Cir. 1987), *overruled on other grounds sub nom. Rake v. Wade*, 508 U.S. 464 (1993).

Chase has not cited—nor has the Court's independent research revealed—a single reported decision equating § 1322(b)(5)'s statutory right of cure with contractual mortgage reinstatement. To the contrary, in the few reported decisions addressing the issue the courts have acknowledged the difference between contractual reinstatement and curing a mortgage arrearage through a Chapter 13 plan. In *In re Seibel*, 82 B.R. 463, 465 (Bankr. S.D. Ohio 1987), Judge Sellers of this Court determined that a contractual reinstatement was not equivalent to the cure remedy afforded under Chapter 13, noting that even if a creditor "had been able to demonstrate contractual entitlement to reimbursement of costs for voluntary reinstatement of a loan, deceleration of a previously accelerated loan and cure of arrearages in that obligation, when compelled by the provisions of a debtor's Chapter 13 plan, do not constitute a voluntary process of reinstatement." *Id.*

The BAP reached a similar conclusion when it compared a federal regulation requiring banks to permit reinstatement of FHA-insured mortgage loans with the cure mechanism provided by Chapter 13. *See Petroff*, 2001 WL 34041797, at *3 n.2. The *Petroff* court emphasized that the reinstatement regulation required "'the mortgagor [to] tender[] in a *lump sum* all amounts required

---

*Chavez*, 117 B.R. 730, 733 (Bankr. S.D. Fla. 1990) (36-month cure reasonable); *Fleet Fin., Inc. v. Randolph (In re Randolph)*, 102 B.R. 902, 903–04 (Bankr. S.D. Ga. 1989) (25-month plan reasonable, even though payments toward arrearage would not begin until the 11th month, and would not be completed until the 35th month); *In re Anderson*, 73 B.R. 993, 996 (Bankr. W.D. Okla. 1987) (17-month cure reasonable); *In re Smith*, 19 B.R. 592, 593 (Bankr. N.D. Ga. 1982) (14-month cure reasonable).

to bring the account current, including foreclosure costs and reasonable attorney's fees and expenses properly associated with the foreclosure action . . . .'" *Id.*, n.2 (quoting 24 C.F.R. § 203.608). The BAP contrasted the regulation's lump-sum payment requirement for reinstatement with the debtor's obligations under his Chapter 13 plan, pointing out that the plan "does not propose to pay anything in a lump sum and only proposes . . . to pay in installments." *Id.* Given this difference between a lump-sum arrearage payment versus installment payments, the BAP concluded that "the concept of cure in Chapter 13 is not the same thing as reinstatement under the regulation." *Id.* (internal quotation marks omitted). *See also In re Alden*, 123 B.R. 563, 568 n.6 (Bankr. E.D. Mich. 1990) ("[T]here is authority for the Debtors' contention that the deceleration of a mortgage and cure of arrearages pursuant to a Chapter 13 plan 'do not constitute a voluntary process of reinstatement.'") (quoting *Seibel,* 82 B.R. at 465).

In *Wells Fargo Bank Minnesota N.A. v. Guarnieri*, 308 B.R. 122, 127 (D. Conn. 2004), the district court considered a creditor's argument that "there is no difference between reinstatement under the [m]ortgage and cure under § 1322[.]" The court disagreed, finding "a considerable economic difference between the two, even if courts sometimes loosely refer to a Chapter 13 'cure' as 'reinstating' a mortgage." *Id.* (citation omitted). Like the BAP in *Petroff*, the *Guarnieri* court contrasted contractual reinstatement, which required the debtor to pay the full amount of the arrearage immediately, and the Chapter 13 statutory cure remedy, which allowed the debtor up to 60 months to pay the arrearage. *Id.* (citing 11 U.S.C. § 1322(d)). Further distinguishing contractual reinstatement from cure, the court observed that the "amount necessary to cure" was determined by reference to the parties' contract, but that "the amount of each individual payment (even post-petition, pre-confirmation payments) and the timing of those payments were determined by the terms

of the plan, not by the parties' contract." *Id.* at 127–28. *See also In re Cureton*, 163 B.R. 494, 496

(Bankr. E.D. Mich. 1994) ("[T]he mortgage and note contemplate that the cure payment be made

in a lump sum. In contrast, § 1322(b)(5) allows a debtor to pay the arrears, not in a lump sum on

day one of the plan, but rather 'within a reasonable time.' There is nothing in the parties' note or

mortgage which even arguably purports to give the Debtors the right to 'string out' the cure payment

over time, much less define the applicable rate of interest to be paid by the Debtors should they

choose to exercise that right.").

Further, at least one court has concluded that a Chapter 13 plan affords a debtor an option

that certainly would not be available in the context of a contractual mortgage

reinstatement—providing a monetary cure of a nonmonetary default. In *Bank of America, N.A. v.

Garcia (In re Garcia)*, 276 B.R. 627 (Bankr. D. Ariz. 2002), a prepetition nonmonetary default,

(which consisted of a violation of a due-on-sales provision in a deed of trust), was permitted to be

cured by payments through a debtor's Chapter 13 plan. The court concluded that, "[t]here is no

basis in law to conclude that a violation of a due on sale clause cannot be compensated in money,

perhaps in a higher interest rate, if the market warrants it." *Id.* at 642. *See also* 2 Keith M. Lundin,

*Chapter 13 Bankruptcy* § 132.1 at 132–6 (3d ed. 2000 & Supp. 2004) ("*Garcia* is carefully reasoned

and convincing. If the power to cure 'any default' in § 1322(b)(3) and (b)(5) means anything, it is

not an invitation for the bankruptcy courts to pick and choose which defaults are curable and which

are not. Instead, the issue is, what constitutes a cure for a nonmonetary default such as a transfer

in violation of the due-on-sale clause. The suggested [monetary] cures in *Garcia* are clever and

translate into plan provisions that mortgage holders might find palatable despite having to deal with

a debtor not of their choosing.").

To sum up, the Debtor here made no attempt to comply with the Mortgage's requirements for contractual reinstatement. There was no tender to Chase of "all sums" due under the contract. Hence, there was in fact no *contractual* reinstatement of the Mortgage. And while Chase attempts to equate the concepts of contractual reinstatement and statutory cure under § 1322(b)(5), it has offered no legal authority to support this argument. Because contractual mortgage reinstatement and the Chapter 13 cure remedy are not one and the same, the reinstatement exception to the Common Law Rule recognized by the *Davidson* and *Mahaffey* courts does not provide a basis for Chase to recover the Fees.

**D.     The Postpetition Fees: § 1322(e) Versus § 506(b)**

Chase also asserts that § 506(b) of the Bankruptcy Code, rather than state law, controls the allowance of its Postpetition Fees because it is an oversecured creditor. Section 506(b) provides that

> [t]o the extent that an allowed secured claim is secured by property the value of which, after any recovery under subsection (c) of this section, is greater than the amount of such claim, there shall be allowed to the holder of such claim, interest on such claim, and any reasonable fees, costs, or charges provided for under the agreement under which such claim arose.

11 U.S.C. § 506(b).

Bankruptcy law is clear, however, that § 1322(e) of the Bankruptcy Code defines the allowable components of a claim to cure a mortgage default under Chapter 13. As previously discussed, § 1322(e) specifies that arrearage claims are governed by the terms of the agreement between the parties and applicable state law:

> *Notwithstanding subsection (b)(2) of this section and sections 506(b) and 1325(a)(5) of this title*, if it is proposed in a plan to cure a default, the amount necessary to cure the default shall be determined in accordance with the underlying agreement and applicable nonbankruptcy law.

40

11 U.S.C. § 1322(e) (emphasis added).

Section 1322(e) was enacted to overrule the Supreme Court's decision in *Rake v. Wade*, 508 U.S. 464 (1993), in which the Court ruled that debtors curing mortgage defaults were required to pay interest on the arrearages.[13]  Congress believed the ruling

> [h]ad the effect of providing a windfall to secured creditors at the expense of unsecured creditors by forcing debtors to pay the bulk of their income to satisfy the secured creditors' claims.  This had the effect of giving secured creditors interest on interest payments, and interest on the late charges and other fees, even where applicable law prohibits such interest and even when it was something that was not contemplated by either party in the original transaction . . . . It is the Committee's intention that a cure pursuant to a plan should operate to put the debtor in the same position as if the default had never occurred.

140 Cong. Rec. H10770 (daily ed. Oct. 4, 1994).

Although it was intended to overrule *Rake*, § 1322(e)'s application is not restricted to the interest component of an arrearage claim; it extends to attorney fees and other costs as well.  *See Landrum*, 267 B.R. at 581; *Lake*, 245 B.R. at 285–86.  In *Shaffer*, Judge Hopkins found that "when the [postpetition] preconfirmation attorney's fees are to be added to an arrearage claim, the general rule that state law does not apply [pursuant to § 506(b)] has been superseded by Congress's 1994 enactment of 11 U.S.C. § 1322(e)."  287 B.R. at 900 (footnote omitted) (citing *Landrum*, 267 B.R. at 579-82); *Landrum*, 267 B.R. at 577, 579–82  (finding that § 1322(e) trumps § 506(b) in a Chapter 13 case because the claim for arrears includes preconfirmation fees); *Lake*, 245 B.R. at 282, 285–86 (same).  As the court in *Plant* noted, by enacting § 1322(e), Congress "disconnect[ed] . . . § 506(b)'s application where a debtor cures a default through a Chapter 13 plan."  *Plant*, 288 B.R. at 641

---

[13]Section 1322(e) became effective on October 22, 1994 and thus is applicable to mortgages entered into after that date.  The Mortgage here was executed on March 15, 2002. Stipulation, ¶ 1.

41

(holding that § 1322(e) governs creditor's arrearage claim for prepetition and postpetition legal

fees).  The *Plant* court added:

> Courts have interpreted § 1322(e) to displace § 506(b)'s requirements
> not only as to interest on arrearages, but also to other fees and costs.
> Thus, § 1322(e) applies with respect to interest, fees and costs to
> every contract effective after October 22, 1994, regardless of whether
> a particular claim is secured or unsecured, oversecured or
> undersecured.

*Id.* at 641–42 (citing *Landrum*, 267 B.R. at 577, 580–81; *Lake*, 245 B.R. at 282, 285).  And the Third

Circuit also has confirmed § 1322(e)'s supremacy over § 506(b), holding that "§ 506(b) has itself

been superceded by 11 U.S.C. § 1322(e)—at least in cases (such as this one) involving [attorney]

fees included in a claim for arrears." *Smiriglio v. Hudson United Bank*, 98 Fed. App'x. 914, 915 (3d

Cir. 2004).

Chase's contention that § 506(b) mandates its recovery of Postpetition Fees simply "ignores

the plain language of [ ] 11 U.S.C. § 1322(e) which begins, '[n]otwithstanding . . . section [ ] 506(b)

. . . of this title,' and states that the amount necessary to cure the arrears under a Chapter 13 plan is

determined in accordance with both the underlying agreement and nonbankruptcy law." *In re*

*Hatala*, 295 B.R. 62, 69 (Bankr. D.N.J. 2003) (rejecting the argument that § 506(b) applies to an

arrearage claim, including pre- and postpetition attorney fees) (quoting 11 U.S.C. § 1322(e)).  "With

regard to § 1322(e) . . . the introductory language, which specifically references §§ 506(b) and

1325(a)(5), makes clear that these sections have no applicability in a cure situation." *In re Young*,

310 B.R. 127, 131 (Bankr. E.D. Wis. 2003) (quoting *Key Bank of N.Y. v. Harko (In re Harko)*,

211 B.R. 116, 122 (B.A.P. 2d Cir.), *aff'd sub nom. Key Bank Nat'l Ass'n v. Milham (In re Milham)*,

141 F.3d 420 (2d Cir. 1997), *cert. denied*, 525 U.S. 872 (1998)).  Based on its plain language, it is

indisputable that § 1322(e), not § 506(b), governs whether the contested components of Chase's

42

arrearage claim are allowable.  Hence, it is state law—here, Ohio's Common Law Rule—rather than Chase's oversecured status, that determines the allowability of the Fees and Costs.

## E.  Equitable Estoppel

Finally, Chase argues that the Debtor should be equitably estopped from "retain[ing] the benefits of deaccelerating [his] loan default without providing any consideration to Chase [in the form of its Fees and Costs] for forgiving [his] default."  Chase Supp. Mem. at 13.  According to Chase, "[a] party cannot, as a matter of law, equitably argue that a portion of a contract is enforceable to the extent it is favorable to that party, while also arguing that the court should strike as unenforceable a condition of that same contract which happens to be unfavorable to that party."  *Id*. at 13–14.

Chase's equitable estoppel argument fails for several reasons.  First, Chase's argument is based on a mistaken factual premise.  Contrary to Chase's contention, the Debtor has neither asked the Court to enforce a "favorable" Mortgage provision—the Reinstatement Provision—nor sought to strike as unenforceable the Mortgage's "unfavorable" attorney fee provisions.  As explained above, rather than invoking his contractual right of reinstatement, the Debtor has instead chosen to cure his Mortgage arrearage by filing a Chapter 13 proceeding and exercising the statutory right of cure conferred by § 1322(b)(5) of the Code.  Nor has the Debtor asked the Court to "strike" the Mortgage's attorney fee provisions.  As previously explained, § 1322(e) requires the Court to determine "the amount necessary to cure the [Mortgage] default . . . in accordance with the underlying agreement and applicable non-bankruptcy law."  11 U.S.C. § 1322(e). A creditor faced with a Chapter 13 debtor's objection to its arrearage claim therefore must establish that its claim is comprised solely of charges that are recoverable under both the parties' contract and applicable law.

43

Thus, rather than asking the Court to strike the Mortgage's attorney fee provisions, the Debtor instead has simply challenged the Arrearage Claim and put Chase to its proof under § 1322(e).

Second, Chase's equitable estoppel argument proceeds from the false assumption that the Court has the power to disregard the Code's operative effect if the result it produces in a given case offends the Court's sense of fairness. "While the Bankruptcy Court is a court of equity, the Bankruptcy Code 'does not authorize freewheeling consideration of every conceivable equity.' The Bankruptcy Court may not, in the exercise of its equitable powers, enforce its view of sound public policy at the expense of the interests the Code is designed to protect." *Midlantic Nat'l Bank v. N.J. Dept. of Envtl. Prot.*, 474 U.S. 494, 514 (1986) (Rehnquist, J., dissenting) (quoting *N.L.R.B. v. Bildisco and Bildisco*, 465 U.S. 513, 527 (1984)). "[W]hatever equitable powers remain in the bankruptcy courts must and can only be exercised within the confines of the Bankruptcy Code." *Miller v. Pa. Higher Educ. Assistance Agency (In re Miller)*, 377 F.3d 616, 621 (6th Cir. 2004) (quoting *Norwest Bank Worthington v. Ahlers*, 485 U.S. 197, 206 (1988)).

What Chase deems to be inequitable here is that the Debtor can cure his default under the Mortgage pursuant to § 1322(b)(5) while at the same time avoiding the obligation to pay the Fees and Costs incurred by Chase as a result of that default. The inequity arises, Chase argues, from the fact that the Fees and Costs would have been payable by the Debtor if he had exercised his contractual right of reinstatement under the Mortgage, yet he can avoid paying the Fees and Costs while achieving precisely the same result—deacceleration and mortgage reinstatement—through a Chapter 13 proceeding. But this outcome is produced by the combined operative effect of two provisions of the Bankruptcy Code—§ 1322(b)(5), which affords Chapter 13 debtors a statutory cure right, and § 1322(e), which places limitations on contractual arrearage claims. Even if it questioned

44

the fairness of a statutory scheme that permits a debtor to exercise a statutory right to cure a mortgage default while avoiding the contractual obligation to pay the fees and costs occasioned by that default, the Court would not be free to disregard the dictates of the Code under the guise of doing equity. *See Holyoke Nursing Home, Inc. v. Health Care Fin. Admin. (In re Holyoke Nursing Home, Inc.)*, 372 F.3d 1, 5 (1st Cir. 2004) ("[T]he equitable powers of the bankruptcy court do not accord it a 'roving commission to do equity . . . .'") (quoting *Noonan v. Sec'y of Health & Human Servs. (In re Ludlow Hosp. Soc'y, Inc.)*, 124 F.3d 22, 27 (1st Cir. 1997)); *ATD Corp. v. Advantage Packaging, Inc. (In re ATD Corp.)*, 352 F.3d 1062, 1066 (6th Cir. 2003) ("The bankruptcy court's broad equitable powers are nonetheless constrained to actions or determinations that are 'not inconsistent' with the Bankruptcy Code."); *Thinking Machs. Corp. v. Mellon Fin. Servs. Corp. # 1 (In re Thinking Machs. Corp.)*, 67 F.3d 1021, 1028 (1st Cir. 1995) ("Of course, the equitable powers of bankruptcy courts are not unlimited. They can only be brought to bear in the service of the Bankruptcy Code. Thus, a bankruptcy court's exercise of its residual equitable powers must be connected to, and advance the purposes of, specific provisions in the Code.") (citing *Ahlers*, 485 U.S. at 206).

Finally, even if the Court were free to modify the substantive rights and obligations created by the Code based on its own notions of equity (which it may not do), the doctrine of equitable estoppel would provide no basis for doing so in this case. "To invoke the doctrine of equitable estoppel, a party must demonstrate: (1) a factual misrepresentation; (2) that is misleading; (3) that induced actual reliance, which was both reasonable and in good faith; and (4) that caused detriment to the relying party." *Mark-It Place Foods, Inc. v. New Plan Excel Realty Trust, Inc.*, 804 N.E.2d 979, 998 (Ohio Ct. App. 2004). "Equitable estoppel arises when one party induces another party

45

to believe that certain facts exist and the other party changes his position to his detriment in

reasonable reliance on those facts." *Id*. Chase has not alleged that the Debtors made a misleading

factual representation that induced detrimental reliance on its part. Perhaps Chase could have

established a basis for applying the doctrine of equitable estoppel had it shown that the Tudors

signed the Mortgage fully intending at the time both to default on their contractual obligations and

cure that default in an ensuing Chapter 13 proceeding. But Chase has made no such allegation in

this case. Therefore, even if the Court were free to alter the operation of the Code based upon

equitable principles, there would be no grounds to do so here.

## F.    The Costs are Recoverable

Chase also seeks recovery of the Costs incurred for title work done by its legal counsel in

preparation for the state court foreclosure action. There is no dispute that the Mortgage provides

for Chase's recovery of title costs. *See* Mortgage § 22 (providing that, upon default, "Lender shall

be entitled to collect all expenses incurred in pursuing . . . [its] remedies . . . including, but not

limited to, costs of title evidence."). And the Debtor has not cited—nor has the Court's independent

research revealed—any authority for the proposition that a mortgagee's recovery of foreclosure costs

is prohibited under Ohio law. In fact, the bankruptcy courts that have considered the issue have

uniformly held that Ohio law permits "[a] mortgagee, as a general rule, . . . [to recover] . . . the costs

of an action to foreclose." *Landrum*, 267 B.R. at 583 n.10 (citation omitted) (allowing foreclosure

costs of $1,595.90). *See also In re Roach*, 285 B.R. 676, 679 n.3 (Bankr. S.D. Ohio 2002) (allowing

foreclosure costs of $966.50) (citing *Landrum*, 267 B.R. at 582); *In re Staud*, Case No. 04-18556,

Order re: Objection to Proof of Claim ("*Staud* Order") (Doc. 38) at 2 (Bankr. S.D. Ohio May, 25,

2005) ("[I]t has generally been understood that *expenses*, such as those associated with foreclosure

actions, i.e., title report, court costs, and sheriff's fees, are proper.") (citations omitted).

The Debtor argues that because the charges in question are, in actuality, attorney fees rather

than costs, they fall within the ambit of the Common Law Rule and thus are not recoverable under

Ohio law. Although the Costs are described in Chase's proof of claim as "Foreclosure Title Work,"

the Debtor argues that Chase has the burden to establish that these charges are not in fact disguised

attorney fees. According to the Debtor, Chase's stipulation that the Costs were for "services

performed by attorneys, paralegals, legal assistants or other employees of [its] legal counsel," *see*

Stipulation, ¶ 7, establishes that the charges for these services constitute attorney fees instead of

costs. Despite this stipulation, Chase disputes the Debtor's characterization of the Costs, asserting

that they were incurred for routine title work performed in anticipation of its foreclosure action and

do not constitute attorney fees. Chase argues that in characterizing the Costs, the Court should focus

on the nature of the services rendered, rather than by whom they were rendered, in determining

whether the charges should be deemed to be attorney fees or costs.

The Debtor offers no support for the proposition that charges attributable to conducting pre-

foreclosure title research should be characterized as attorney fees simply because an attorney, a

paralegal, or a non-lawyer employee of the attorney's firm completes the title work. Indeed, courts

have consistently differentiated between attorney fees and title costs. *See In re Campbell*, 138 B.R.

184, 187 (Bankr. S.D. Ohio 1991) ("[F]iling fees and a title search [ ] are *costs* which flow naturally

from such [a foreclosure] action.") (emphasis added); *In re Bertsch*, 17 B.R. 284, 288 (Bankr. N.D.

Ohio 1982) (allowing recovery of costs of title search in a foreclosure action, because it was a

necessary prerequisite to such an action, but disallowing claim for attorney fees based on the

47

Common Law Rule).  In distinguishing between attorney fees and costs, courts have looked to the nature of the service performed rather than the identity of the service provider.  *See*, *e.g.*, *Staud* Order at 2 ("[A] foreclosing party should not be penalized for using an attorney to perform a title examination. . . ."); *Beck v. Codilis & Stawiarski, P.A.*, 2000 WL 34490402, at **3–4 (N.D. Fla. Dec. 27, 2000) (finding that $300 cost of title research charged by a law firm in preparation for a foreclosure action did not constitute an attorney's fee).

In sum, Chase has sustained its burden of persuasion with respect to allowance of its Costs. The Mortgage grants Chase a contractual right to recover the Costs, and their recovery is not prohibited by Ohio law.  And it does not necessarily follow from the fact that the pre-foreclosure title work here was performed by attorneys, paralegals or other law firm employees that the charges for these services constitute attorney fees.  The Court finds that it is the nature of the service, rather than the identity of the person or entity who performs it, that should govern how the charge for such service is characterized.  Because title work may be done by attorneys and nonlawyers alike, the Court concludes that the Costs do not constitute disguised attorney fees, and their recovery accordingly is not barred by the Common Law Rule.[14]

---

[14]Of course, the fact that Ohio law does not prohibit recovery of foreclosure costs does not give a foreclosing creditor a blank check.  As Judge Aug noted in *Staud*, an attorney's charge for completing pre-foreclosure title work must be reasonable and must not exceed the cost at which the service could have been obtained from a non-attorney.  *Staud* Order at 2.

## V.  Conclusion

For these reasons, the Court finds that Chase may not include its Fees in the Arrearage Claim, but may recover its Costs. A separate order **SUSTAINING** Debtor's objection to the allowance of the Fees and **OVERRULING** his objection to the allowance of the Costs shall be entered.

**IT IS SO ORDERED.**

Copies to:

Paul Allen Tudor, *Debtor, 8181 York Road, Pataskala, OH 43062*
Todd G. Finneran, *Attorney for Debtor, 380 S. Fifth Street, Suite 4, Columbus, OH 43215*
Tracey M. Johnson, Rick D. DeBlasis, Edward J. Boll, III,
    *Attorneys for Chase Manhattan Mortgage Corporation, P.O. Box 5480,*
    *Cincinnati, OH 45201*
Frank M. Pees, Chapter 13 Trustee, *130 E. Wilson Bridge Road, Suite 200,*
    *Worthington, OH 43085*
Office of the U.S. Trustee, *170 N. High Street, Suite 200, Columbus, OH 43215*